**Jonathan SLOCUM, as Executor of the Estate of Elvira E. Slocum, Deceased, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 64 Civ. 3057.

United States District Court
S. D. New York.

June 20, 1966.

On Reargument July 14, 1966.

9. See e. g., paragraph 18(a) of plaintiffs' Complaint.

Joseph C. Woodle, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defendant; Grant B. Hering, Asst. U. S. Atty., of counsel.

## OPINION

LEVET, District Judge.

The plaintiff moves for summary judgment in this action for refund of federal estate taxes paid pursuant to a determination of the Commissioner of Internal Revenue that the values of the stock of two corporations, Tioronda Company, Inc. (hereinafter "Tioronda") and Craig House Corporation (hereinafter "Craig House"), comprising part of the estate of Elvira E. Slocum (hereinafter "decedent"), were greater than the values at which they were reported in her federal estate tax return. The stock of both corporations was subject to restrictive agreements. The plaintiff contends that the agreements fix the respective values of the stock for estate tax purposes. The government denies this assertion.

The question of the effect of a restrictive agreement on the valuation of corporate stock for estate tax purposes has been passed on by the courts of this circuit. In three cases, Wilson v. Bowers, 57 F.2d 682 (2nd Cir. 1932), Lomb v. Sugden, 82 F.2d 166 (2nd Cir. 1936),

and May v. McGowan, 194 F.2d 396 (2nd Cir. 1952), the Second Circuit has held that restrictive agreements, enforceable both at death and during a person's lifetime against stock held by such person, establish the value of that stock for estate tax purposes. Accord Brodrick v. Gore, 224 F.2d 892 (10th Cir. 1955). Implicit in those rulings and necessary for effective tax administration is the rule stated in Treas. Reg. § 20.2031–2 (h) that "[e]ven if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth." In May v. McGowan, supra, the court specifically noted that the trial judge had found no tax avoidance motive in the agreement.[1]

The question now is whether, upon application of the above principles to the agreements and facts of this case, general issues of material fact exist which must be tried and which preclude summary judgment for the plaintiff.

## TIORONDA STOCK

The decedent held 152 shares of Tioronda at her death. This stock was subject to an agreement, dated January 26, 1945, between the owners of all the stock of Tioronda at that time, that is, the decedent, her husband, her son, her daughter, and one Thomas H. DeLaire. Under that agreement if one of the parties chose to sell his stock or died, his stock had to be offered to the other parties in an order specified by the agreement at $100 per share. There is no doubt that the agreement was binding among the parties both during their lives and at death and that it gave the surviving optionees the right to purchase

1. As to the effect of restrictive agreements, see, generally, Warren & Surrey, Federal Estate and Gift Taxation, 630–647 (1961).

the decedent's shares at $100 per share in accordance with the agreement. See Scruggs v. Cotterill, 67 App.Div. 583, 73 N.Y.S. 882 (1st Dept. 1902). Pursuant to the agreement, the Tioronda stock was valued at $100 per share on decedent's estate tax return; the Commissioner set its value at $572.92 per share.

[1] In 1945, when the agreement was made, it appears that the decedent's husband was attempting to interest his son, the plaintiff, in joining him in the operation of Craig House, a mental hospital. While this may provide a business purpose for the agreement, it also appears that in 1945 the health of the decedent's husband was failing. That situation and the family relationship among the parties in reference to the agreement may provide the basis for an inference that the agreement was actually testamentary in character and a device for the avoidance of federal estate taxes. Since varying inferences may be drawn from the facts surrounding the Tioronda agreement, the drawing of those inferences is for the trier of the facts at trial. Empire Electronics Co. v. United States, 311 F.2d 175 (2nd Cir. 1962). Thus, as to the value of Tioronda stock, I conclude that there are genuine issues of material fact which preclude summary judgment.

## CRAIG HOUSE STOCK

I have reached a different conclusion with respect to the Craig House Stock. The decedent held 15 shares of Craig House stock at her death. Under Article Tenth of Craig House's certificate of incorporation, adopted in 1915, no stockholder could sell, assign or in any way dispose of any of his holdings without giving the other then stockholders the right to acquire a proportionate share of such holdings by purchase at $100 per share. While Article Tenth is not crystal clear, it appears, and the government does not deny, that that provision in the certificate of incorporation was binding on

the decedent and enforceable as to any transfer of the decedent's shares both before and after her death. See Bank of Attica v. Manufacturers' and Traders' Bank, 20 N.Y. 501 (1859); Cowles v. Cowles Realty Co., 201 App.Div. 460, 194 N.Y.S. 546 (1st Dept. 1922); Bloomingdale v. Bloomingdale, 107 Misc. 646, 177 N.Y.S. 873 (Sup.Ct.1919). The taxpayer valued the Craig House stock at $100 per share; the Commissioner set its value at $1,108.62 per share.

The certificate of incorporation with Article Tenth thereof was adopted in 1915. At such date, no federal estate tax existed,[2] and that fact, as the government recognizes (Memorandum of Law, p. 21), negates any tax avoidance purpose. The government also does not seriously contend that Article Tenth was not a bona fide business arrangement; the government's memorandum states: "The restriction * * *, in all likelihood, served a business purpose at that time." (p. 21) In so stating, the government is, no doubt, referring to the purpose of keeping control of a business in its present management which is recognized as a business purpose. Estate of Littick, 31 T.C. 181, 187 (1958), acq., 1959–2 Cum.Bull. 5.

The government, however, contends that a tax avoidance motive on the part of the decedent and her husband is shown after 1945 by "keeping Article Tenth in the Certificate of Incorporation long after any original purpose for it evaporated." (Memorandum of Law, p. 23) The government, in effect, would place an affirmative duty on the decedent and her husband as majority shareholders of Craig House to delete a provision of the certificate of incorporation when, as the government contends, its purpose ceased to exist on the ground that the provision might reduce the potential estate tax liability of the decedent (or her husband). The government cites no authority for this novel proposition,

---

**2.** In 1916, an estate tax was enacted in the Revenue Act of 1916, 39 Stat. 777. For the history of estate and inheritance tax-

es, see Warren & Surrey, Federal Income and Gift Taxation, 1–9 (1961).

and I find none. I do not see how, as a matter of law or fact, events thirty years after the adoption of a provision in a certificate of incorporation can affect either the bona fide nature of such provision or the non-existence of a tax avoidance purpose at its inception. To my mind, Article Tenth was a bona fide business arrangement and not a tax avoidance device and, therefore, meets the requirements of Treas.Reg. § 20.2031–2 (h). I conclude that there is no genuine issue of material fact as to this.

The government also claims that there is a genuine issue of material fact as to whether the restrictions in Article Tenth of the Craig House certificate were actually followed by the shareholders. Neither the pleadings nor the affidavits nor other proofs submitted by the government on this motion set forth any facts showing that there is a genuine issue on this point as required by Rule 56(e) of the Federal Rules of Civil Procedure. Moreover, the reply affidavit of the plaintiff states affirmatively that the restrictions have been followed. Under such circumstances, it is proper to state that there is no genuine issue of material facts as to whether the restrictions in Article Tenth were followed.

I conclude, therefore, that plaintiff is entitled to summary judgment as to his claim for refund with respect to the Craig House stock. There is no just reason for delay in entering such judgment. In all other respects, plaintiff's motion for summary judgment is denied.

Settle order and judgment on notice.

### OPINION ON REARGUMENT

The United States has moved to reargue that part of my decision on plaintiff's motion for summary judgment which granted judgment in plaintiff's favor with reference to the estate tax on the stock of the Craig House Corporation.

The thrust of defendant's present argument is the claim that the court is compelled to examine the facts and circumstances existing at the time of decedent's death (1961) rather than those existing at the time when the Certificate of Incorporation was adopted (1915) to determine whether the restrictive agreement contained in the Certificate had a business purpose (and no tax avoidance purpose). The government, inferentially at least, concedes that the restrictive agreement had a business purpose in 1915, but it would require that the agreement be reappraised as of 1961, when decedent died, and would have the 1961 facts be controlling.

The government further argues that "the mother and her two children could have (at the time of decedent's death) amended the Certificate of Incorporation to eliminate the restriction and thereby open the door to a sale at a larger price than $100 per share." (Brief of United States, p. 3) This latter argument may be disposed of summarily since it disregards the fact that decedent alone could not obtain this result; unilaterally she had no right to do so, and she was bound by the terms of the restriction.

The crux of the matter on this motion for reargument is the point in time from which the determinative facts are to be drawn as to a business purpose or tax avoidance purpose for estate tax purposes in regard to a restrictive agreement which limits the value of corporate stock. Such agreements are not binding for estate tax purposes when the agreement does not represent "a bona fide business arrangement" or is "a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth." Treas. Reg. § 20.-2031–2(h). The Regulation, however, does not specify what point in time is determinative. In my view, the facts at the inception of the agreement control. If no business purpose or a tax avoidance purpose exists at that time, the agreement is tainted from the start and nothing, except cancellation, can change that. If a business purpose and no tax avoidance purpose exist at inception, the agreement, at least at that time, is controlling for estate tax purposes. See May v. McGowan, 194 F.2d 396 (2nd Cir. 1952). To alter that effect

on the basis of circumstances many years after the adoption of the agreement is to taint the agreement retroactively and to read implications into the agreement which are not there.

The federal estate tax is applied to the value of property held by the decedent at his or her death. Internal Revenue Code of 1954, § 2033. An enforceable restrictive agreement may effectively reduce the value of corporate stock below what would be its value without such an agreement. In determining whether the agreement is binding for estate tax purposes, it is necesssary to examine the reasons for entering into the agreement, and I suggest that that can only be done by looking at the facts at the time that the agreement was adopted.

I have been unable to find any authority and counsel for the United States has presented no authority for the position asserted upon this motion for reargument. I see no reason to adopt such a ruling.

The motion to reargue is granted and upon such reargument the previous decision is affirmed.

So ordered.